73 F.3d 381
NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
 Louis ALIOTA, Petitioner,
v.
DEPARTMENT OF VETERANS AFFAIRS, Respondent.
 No. 95-3190.
 United States Court of Appeals, Federal Circuit.
 Dec. 21, 1995.
 
 Before RADER, Circuit Judge, SMITH, Senior Circuit Judge, and BRYSON, Circuit Judge.
 DECISION
 PER CURIAM.
 
 
 1
 Louis Aliota petitions for review of the final decision of the Merit Systems Protection Board in Aliota v. Department of Veterans Affairs, 65 M.S.P.R. 644 (1994), upholding Aliota's 60-day suspension and geographical reassignment. We affirm.
 
 BACKGROUND
 
 2
 In 1987, Bristol-Myers U.S. Pharmaceutical and Nutritional Group commissioned a clinical study of one of its antibiotics and sought to have a number of Veterans Administration (VA) medical centers participate in the study. Aliota, the Chief of Pharmacy at the VA Medical Center in Erie, Pennsylvania, obtained permission to participate from the medical center's director, Jack Graham. Aliota subsequently negotiated a contract with Bristol-Myers under which the medical center would collect data on the antibiotic over a 15-month period in return for five periodic payments of $4500 by Bristol-Myers. Bristol-Myers made all of the required payments, which were deposited in the account of the Lake Area Health Education Center, a nonprofit organization authorized to accept money from private sources to help fund educational needs of VA employees and to provide community education. Aliota was given approval authority for the use of the funds from the study.
 
 
 3
 On July 19, 1988, Bristol-Myers issued a check for $9000 payable to the Lake Area Health Education Center, noting that it was the final installment for the study. Aliota telephoned Bristol-Myers the next day and requested that the payee of the check be changed. Bristol-Myers instructed Aliota to make his request in writing, and by letter dated July 21, 1988, Aliota requested that the $9000 check be reissued and made payable to him to cover his and his assistant's "private consultative services ... separate from the Veterans Administration." Bristol-Myers contacted Aliota and requested a second letter clarifying that the $9000 sought by Aliota was not in addition to the final $9000 of the contract. Aliota replied in a letter dated July 29, 1988, that the final $9000 payment for the consultative services would complete Bristol-Myers' obligations under the contract.
 
 
 4
 On August 11, 1988, Bristol-Myers issued a check for $9000 payable to Aliota, who thereafter deposited it in his personal account. Aliota then issued a personal check to his deputy, James Kendall, for $4500. Kendall later informed Graham about the payment. After verifying the facts with Bristol-Myers, Graham contacted the VA's district counsel, who in turn contacted the agency's Office of the Inspector General. Following an investigation, the Inspector General found that Aliota diverted $9000 from the clinical study to his personal use. The Inspector General's findings were first referred to the United States Attorney, who declined prosecution. Thereafter, the Inspector General presented a final report to Graham, who was informed that the agency could proceed with its own investigation.
 
 
 5
 Graham then established a three-person review board. On June 11, 1990, the board presented its final report to Graham finding that Aliota had violated agency regulations and the federal conflict of interest statute, 18 U.S.C. Sec. 209, by receiving private compensation for his service to the government. As a penalty, the board recommended that Aliota be terminated. The Inspector General's report and the report of the administrative board were forwarded to Donald E. Burnette, Regional Director for the Eastern Region of the VA, who proposed that Aliota be suspended rather than fired. Burnette also reassigned Aliota to the VA medical center in Northport, New York. On January 8, 1992, Sanford Garfunkel, the VA's Associate Chief Medical Director for Operations, formally decided to suspend Aliota for 60 days. Kendall received no penalty for his conduct in connection with the affair.
 
 
 6
 Aliota appealed the agency's action, and an administrative judge recommended mitigation of the penalty to a suspension without reassignment based on her conclusion that Aliota and Kendall had been subjected to disparate treatment. Upon review, the Board determined that Aliota and Kendall were not similarly situated. The Board then remanded the case to the administrative judge for additional consideration of whether Graham had condoned Aliota's conduct in seeking and retaining the funds from Bristol-Myers. On remand, the administrative judge found that Graham had not condoned Aliota's conduct, and upheld both the 60-day suspension and the geographical reassignment. Aliota appealed the judge's supplemental decision, and the Board affirmed. This appeal followed.
 
 DISCUSSION
 
 7
 Aliota contends that he is entitled to the legal status of a whistleblower for having made various reports about conditions at the Erie VA medical center and about Graham's management of the facility. Based on that claim, he contends that the Board erred in failing to find that Graham's animosity towards Aliota for his whistleblowing activities was a contributing factor in the agency's ultimate action against him.
 
 
 8
 The analysis of an employee's whistleblower defense to adverse agency action entails three steps: (1) determining whether the employee's disclosure is a protected activity under 5 U.S.C. Sec. 2302(b)(8); (2) determining whether the disclosure was a contributing factor in the adverse action; and (3) determining whether the agency has proved by clear and convincing evidence that it would have taken the same action in the absence of the disclosure. Marano v. Department of Justice, 2 F.3d 1137, 1140-41 (Fed.Cir.1993).
 
 
 9
 Although Aliota discusses the second element at length, we focus our attention on the third element because it is dispositive. Garfunkel, the deciding officer, testified that because of the serious, illegal nature of Aliota's conduct, the same penalty would have been imposed regardless of Graham's animosity towards him.
 
 
 10
 The administrative judge and the Board concluded that, even if the agency's actions against Aliota were tainted by Graham's involvement in the disciplinary process, the agency had satisfied its burden of proving that it would have taken the same action against Aliota in the absence of his whistleblowing activities. That conclusion was based on Garfunkel's testimony, which the administrative judge and the Board found to be entirely credible. We see no reason to disturb that conclusion because such credibility determinations are "virtually unreviewable." Hambsch v. Department of Treasury, 796 F.2d 430, 436 (Fed.Cir.1986).
 
 
 11
 Aliota bases his challenge to the Board's finding in large measure on the assertedly disparate treatment accorded to Aliota and his deputy, Kendall. The Board, however, found that the two men were not similarly situated and that the difference in the treatment they received therefore did not provide a basis for inferring that Aliota was penalized for whistleblowing. Not only was Kendall of lower rank in the organization than Aliota, as the Board noted, but while Kendall received some of the diverted funds, Aliota played a much more active role in the scheme, directing Bristol-Myers to make him the payee on the last $9000 check and pursuing the issue when Bristol-Myers sought confirmation that the money should be sent to him personally, rather than to the Lake Area Health Education Center. Aliota's "disparate treatment" argument therefore does not rebut the Board's conclusion that the agency proved by clear and convincing evidence that it would have taken the same action against Aliota regardless of his alleged whistleblowing activities.
 
 
 12
 Aliota argues, in addition, that the Board failed to address the mitigating factors pertaining to his geographical reassignment. Although the Board did not directly address the mitigating factors bearing on that aspect of Aliota's penalty, it correctly noted that the administrative judge's reinstatement of the original penalty of suspension and reassignment would be appropriate if it fell within the bounds of reasonableness. The Board's decision sustaining the penalty must be upheld if there was sufficient consideration by the agency of the factors set forth in Douglas v. Veterans Administration, 5 M.S.P.R. 280, 306 (1981).
 
 
 13
 The administrative judge set forth the Douglas factors that she considered relevant to this case, and she noted that Garfunkel had considered those factors before deciding on the reasonableness of the proposed penalty. In particular, Garfunkel testified that while he considered Aliota's misconduct to be extremely serious, there were mitigating factors in this case: Aliota's clean employment record, the turmoil that had taken place at the medical center, and "the role [Graham] might have played." Indeed, he testified that the mitigating factors influenced him not to remove Aliota altogether, but to select a lesser penalty instead. Nonetheless, Garfunkel felt that Aliota's conduct constituted a clear and serious conflict of interest justifying stern disciplinary measures. Although Garfunkel regarded the geographical reassignment as a separate issue from the penalty of suspension, he was aware of the reassignment and agreed that it was appropriate. Under these circumstances, we find no basis for overturning the Board's decision upholding the penalty imposed on Aliota against the charge of undue severity.